STATE OF CONNECTICUT *v.* DOUGLAS JOHNSON
(13499)

PETERS, C. J., SHEA, COVELLO, HULL and SANTANIELLO, Js.

Argued December 13, 1989—decision released March 6, 1990

*Suzanne Zitser,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

HULL, J. A jury found the defendant, Douglas Johnson, guilty of murder in violation of General Statutes § 53a-54a (a),[1] arson in the first degree in violation of General Statutes § 53a-111 (a) (1),[2] and larceny

[1] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] "[General Statutes] Sec. 53a-111. ARSON IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

in the sixth degree in violation of General Statutes §§ 53a-119 and 53a-125b (a).[3] The trial court thereupon sentenced him to a total effective sentence of eighty-five years and ninety days incarceration. On appeal from this judgment, the defendant claims that the trial court erred in: (1) admitting into evidence the testimony of five state's witnesses whose taped statements had been destroyed by the investigating police department prior to the commencement of trial; and (2) including in its charge language that had the effect of diluting the state's burden of proving guilt beyond a reasonable doubt. We find no error.

The jury could reasonably have found the following facts. On the night of March 6, 1987, the defendant and his cousin, Edward Lambert, were having drinks at the Yale Bowl Cafe in New Haven. While there, they observed an altercation between a man, later identified as Charles Strickland, and a woman, later identified as Kelly Allen Meyer. The defendant intervened to break up the fight and ultimately escorted Strickland out of the bar. The defendant thereafter returned to the Yale Bowl Cafe and remained in the bar for one or two hours before leaving. During that time, the defendant spoke with Meyer and ultimately left the bar arm-in-arm with her at approximately 2 a.m.

Lambert, who left the bar with Meyer and the defendant, drove them to Meyer's apartment building located two blocks from the Yale Bowl Cafe. When they arrived at the apartment building, the defendant and Meyer got out of the car and the defendant indicated to Lam-

---

[3] General Statutes § 53a-119 provides in pertinent part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

General Statutes § 53a-125b (a) provides: "A person is guilty of larceny in the sixth degree when he commits larceny as defined in section 53a-119 and the value of the property or service is two hundred fifty dollars or less."

bert that he would walk home. Consequently, Lambert drove away. The defendant and Meyer then entered Meyer's apartment and went into her bedroom. At some point thereafter, the defendant repeatedly stabbed Meyer with a barbeque fork and strangled her with an antenna wire. Subsequent to Meyer's death from these wounds, the defendant set fire to her room.

The defendant fled the scene on foot, taking with him Meyer's purse and the barbeque fork. He either dropped or discarded some of the contents of the purse on the street as he fled in the direction of his home. He attempted to conceal the barbeque fork and the other items from Meyer's purse in a storm drain also located along a path between Meyer's apartment and his home. The defendant was arrested on April 6, 1987.

Since certain procedural facts are significant to this appeal, we will detail those facts prior to discussing the substance of the defendant's claims of error. During the investigation into the crimes for which the defendant was tried, statements were given to the New Haven police by Margo Hudson, Willie Kirkland, Brian Simmons, Virginia Hagberg, and Eloise Lambert. The police tape recorded these statements and then erased the recordings subsequent to their transcription. Faced with the fact that the destruction of the tapes would render impossible the state's compliance with General Statutes § 54-86b[4] and Practice Book § 752 et

---

[4] "[General Statutes] Sec. 54-86b. RIGHT OF ACCUSED TO EXAMINE STATE-MENTS. (a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

seq.,[5] the state filed a motion in limine prior to the commencement of trial. The state requested in this motion that an "evidentiary hearing be held concerning the destruction by the police department of tapes of statements by critical state witnesses" and that "a ruling [be made] as to the admissibility of trial testimony of such witnesses."

A hearing was held on May 3, 5 and 6, 1988, during which testimony was heard from the individuals who had given the tape recorded statements that had been destroyed and from the police officers who were involved in the recording and/or destruction of those tapes. The testimony concerned the making of the tape recorded statements, the adoption of the typed transcriptions of the statements by each witness, and the destruction of the tapes. After hearing the testimony, the trial court made its ruling on the admissibility of the witnesses' testimony at trial.[6] The court first deter-

[5] "[Practice Book] Sec. 752.——  ——PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

"[Practice Book] Sec. 755.——  ——FAILURE TO COMPLY WITH ORDER

"If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

Practice Book § 749 defines "statement" as "(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

[6] At the time the trial court made its ruling, the most recent decision concerning police destruction of witnesses' taped statements was *State* v. *Williamson,* 14 Conn. App. 108, 552 A.2d 815 (1988). The trial court thus

mined that the tapes had been destroyed in "bad faith," but that there was no basis to conclude that the "erasure . . . was maliciously motivated or directed at this defendant in particular." Accordingly, the trial court shifted the burden to the state to establish that the defendant had not been prejudiced by the destruction and absence of the tape recorded statements. The court then concluded that while it was difficult to evaluate prejudice without the trial testimony of each witness, it was satisfied that the state had, at this preliminary stage, met its burden of proving that the defendant had not been prejudiced. The court expressed its willingness, however, to reconsider its ruling after the trial testimony of each witness, based on the state of the record at the completion of each witness' testimony. The defendant was thus encouraged to file either a motion to strike or a motion for a mistrial after the testimony of any witness whose statements could not be produced by the state as required by General Statutes § 54-86b and Practice Book § 752. As a result of the trial court's ruling on its motion in limine, the state called each of the five witnesses to testify at trial.[7]

---

relied on this decision in making its ruling. During the pendency of the defendant's appeal, however, we heard on certification the appeal from the Appellate Court's decision in *Williamson. State* v. *Williamson,* 212 Conn. 6, 562 A.2d 470 (1989), and its impact on the present case will be discussed infra.

[7] The following is a summary of the relevant trial testimony given by each of the five witnesses. Margo Hudson, a patron in the Yale Bowl Cafe on the night of March 6, 1987, testified that the defendant spoke with Meyer in the bar on March 6, 1987, and left arm-in-arm with her at approximately 2 a.m. Willie Kirkland, Meyer's landlord, testified that he heard Meyer and an adult male walking upstairs toward Meyer's apartment at approximately 2 a.m. He further testified that approximately one half hour later, he was awakened by a noise from Meyer's bedroom that sounded like a body falling out of a bed. Brian Simmons, who was babysitting for Meyer's children in her apartment, testified that, sometime between 12:30 a.m. and 2 a.m., he was awakened and heard Meyer crying in her bedroom and talking with a black man who had "a smooth educated voice." Simmons iden-

# I

The defendant first claims error in the trial court's admission into evidence of the testimony of these five witnesses. Relying on General Statutes § 54-86b and Practice Book §§ 752 and 755, the defendant contends that the admission of this testimony constitutes reversible error in that: (A) a per se rule of reversal is appropriate when a witness, whose tape recorded statement was intentionally destroyed, is permitted to testify at trial; or in the alternative (B) the destruction of the tapes so prejudiced the defendant that the state's nonproduction of them cannot be rendered harmless. We conclude that under the facts here presented, reversal of the defendant's conviction is not required.

# A

We first address the defendant's claim that the trial court's admission into evidence of the testimony of the witnesses whose tape recorded statements had been destroyed by the investigating police department requires the application by this court of a per se rule of reversal. The defendant implores us to invoke our supervisory powers; Practice Book § 4183;[8] in order

---

tified the defendant's voice as one of two possible voices that he had heard. Virginia Hagberg testified that she was walking her dog at 5:15 a.m. on March 7, 1987, when she found some of the contents of Meyer's purse strewn along the street. Finally, Eloise Lambert, Edward Lambert's wife, testified that the defendant had stated in her presence that the source of the blood stains on the t-shirt he had worn the night of the alleged crimes was a cut that he had sustained at work. The blood stains, according to forensic experts, however, were consistent with Meyer's blood and inconsistent with that of the defendant.

[8] Practice Book § 4183 provides in relevant part: "The supervision and control of the proceedings on appeal shall be in the supreme court from the time the appeal is filed, or earlier, if appropriate, and, except as otherwise provided in these rules, any motion the purpose of which is to complete, correct or otherwise perfect the trial court record for presentation

to effectuate the provisions of General Statutes § 54-86b and Practice Book §§ 752 and 755. Under the circumstances here presented, we decline to do so.

During the pendency of this appeal, this court considered a similar claim; *State* v. *Williamson,* 212 Conn. 6, 562 A.2d 470 (1989); in which we made certain determinations that are dispositive of the defendant's contention that a per se rule of reversal is appropriate in this case. We first determined that if a case involves intentional, but not bad faith, destruction of the statement of a state's witness, an automatic sanction of striking that witness' testimony is not required. Id., 15–16. Rather, in the absence of bad faith, the court "must weigh the state's culpability against any prejudice resulting to the defendant to determine whether the trial court abused its discretion in not striking [a witness'] testimony. *State* v. *Shaw,* [185 Conn. 372, 386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982)]; *State* v. *Santangelo,* [205 Conn. 578, 587–88, 534 A.2d 1175 (1987)] . . . ." (Citation omitted.) *State* v. *Williamson,* supra, 16. "In the context of a § 752 violation . . . the term 'bad faith' connotes a deliberate act done with intent to deprive the defense of information. *State* v. *Santangelo,* supra; see also *United States* v. *Bryant,* 439 F.2d 642 (D.C. Cir. 1971) (recognizing that 'intentional non-preservation' and 'bad faith' are not synonymous)." *State* v. *Williamson,* supra.

In the present case, the trial court specifically found that the destruction of the witnesses' tape recorded statements was not "maliciously motivated or directed at this defendant in particular."[9] Therefore, under *Wil-*

---

to the supreme court shall be made to it. The court may, on its own motion, modify or vacate any order made by the trial court, or a judge thereof, in relation to the prosecution of the appeal."

[9] The trial court characterized the conduct of the New Haven police as "bad faith" in reliance on the definition given that term by the Appellate

*liamson,* the trial court's finding indicates that the non-preservation of the investigatory tapes here involved did not constitute "bad faith" police conduct. The defendant has not challenged the trial court's finding concerning the intent of the police in destroying the tape recorded statements. Accordingly, we conclude that the conduct of the New Haven police was not such as to require reversal of the defendant's conviction without further inquiry into the particular facts of this case.

B

We turn, therefore, to the defendant's alternative claim of error. The defendant contends that the trial court erred in not striking the testimony of the witnesses because the destruction of the tapes so prejudiced him that the state's nonproduction of them cannot be rendered harmless.

Initially, we note that at trial the defendant moved to strike under Practice Book § 755 *only* the testimony of Brian Simmons. Practice Book § 4185 provides in part: "The supreme court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." The defendant argues that by articulating his objections to the witnesses' trial testimony at the pretrial hearing on the state's motion in limine, he sufficiently preserved his claim of error with respect to each of the five witnesses. The defendant relies on the following language of Practice Book § 4185 to support his position: "In jury trials, where there is a motion, argument, or offer of proof or evi-

---

Court in *State* v. *Williamson,* 14 Conn. App. 108, 117, 552 A.2d 815 (1988). We altered the Appellate Court's definition of "bad faith" in the context of General Statutes § 54-86b and Practice Book § 752 violations; *State* v. *Williamson,* 212 Conn. 6, 15–16, 562 A.2d 470 (1989); and thus the label of "bad faith" given the police conduct by the trial court is not dispositive of this issue.

dence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, and counsel has fully complied with the requirements for preserving any objection or exception to the judge's adverse ruling thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same."

It is our view that this language of § 4185 is inapplicable to the present facts in that the trial court, on the issue of striking the witnesses' trial testimony, issued only a preliminary ruling at the pretrial hearing, not a final adverse ruling. The court clearly stated that "even though the Court is ruling as it is now, it is in the nature of a preliminary ruling based on the state of the record at this time, and therefore the defendant will still be free to move to strike certain testimony or for mistrial, whatever he deems is appropriate, because of the failure of the State to comply with Section 755 of the Practice Book, and [General Statutes § 54-86b], by delivering the statement which obviously is not going to be delivered." It was thus incumbent on the defendant to seek a definitive ruling on the striking of each witness' testimony after each had testified at trial in order fully to comply with the requirements of our rules of practice for preserving his claim of error with respect to each of those witnesses.

The defendant argues that even if he did not properly preserve his claim of error with respect to four of the five state's witnesses, review by this court under the plain error rule of Practice Book § 4185 is appropriate. We do not agree. Practice Book § 4185 provides that this court "may in the interests of justice notice plain error not brought to the attention of the trial

court." "Such review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985). Under the facts here presented, we cannot say that the court's failure to strike the testimony of the four witnesses constituted a manifest injustice to the defendant so as to impair the effectiveness or integrity of his trial.[10] Accordingly, there is no plain error in this case.

We will therefore focus our analysis on the trial court's refusal to strike the trial testimony of Brian Simmons.[11] Simmons testified that on the night of March 7, 1987, he was in Meyer's apartment, babysitting for her children. He had fallen asleep, but was awakened some time between 12:30 a.m. and 2 a.m., by sounds from Meyer's bedroom. Simmons testified that he heard Meyer crying in her bedroom and talking with a black man who had "a smooth educated voice." He further testified that he had identified the

---

[10] The defendant argues that plain error review is appropriate because we have in the past stated that a trial court's failure to follow the mandatory provisions of a statute prescribing trial procedures or to follow a procedural rule is plain error. *State* v. *Pina,* 185 Conn. 473, 482, 440 A.2d 962 (1981). We note, however, that the express language of the disclosure provisions provides that in order for the mandates of General Statutes § 54-86b and Practice Book § 752 to apply and thereby compel discovery, the defendant must make a motion to the trial court for production of the witness' statement.

[11] The defendant claims that we must also determine whether the trial court's *pretrial* ruling concerning the prejudice to the defendant by the destruction of the tapes of the five witnesses was error. At the pretrial hearing, however, the witnesses testified only about the procedures involved in the making and adoption of their statements. No substantive testimony was given. Our case law clearly indicates that the substance of the witnesses' trial testimony is crucial to the determination of whether the defendant suffered prejudice as a result of the destruction of the investigatory tapes. *State* v. *Williamson,* 212 Conn. 6, 24–25, 562 A.2d 470 (1989). The anticipated substance of the trial testimony was not presented to the court during the pretrial hearing.

defendant's voice as one of two possible male voices that he had heard. Subsequent to this testimony, since the state was unable fully to comply with General Statutes § 54-86b and Practice Book § 752 et seq., the defendant moved to strike Simmons' testimony in its entirety. The trial court denied the motion, finding that the state had established that the defendant had suffered no prejudice from the destruction of Simmons' tape recorded statement. The defendant claims that the trial court erred in denying his motion to strike Simmons' testimony. We do not agree.

The determinations we made in *State* v. *Williamson,* supra, provide the foundation for our analysis of the propriety of the trial court's denial of the defendant's motion. As stated previously, in the absence of bad faith, it is appropriate that the court weigh " 'the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. *State* v. *Myers,* [193 Conn. 457, 467, 469, 479 A.2d 199 (1984)]; *State* v. *Shaw,* [supra, 386].' *State* v. *Santangelo,* supra, 587–88; *State* v. *Mullings,* [202 Conn. 1, 10, 519 A.2d 58 (1987)]." *State* v. *Williamson,* supra, 14. This approach gives broad discretion to the trial court. Id. Where, as in the present case, the destruction of a witness' statement, although not in bad faith, is deliberate, the state properly bears the burden of establishing harmlessness.[12] Id., 18. "[T]he proper harmless error inquiry is whether the result of the trial may have been different had the state not violated the rule." Id., 19. *Williamson* did not, however, establish the appropri-

---

[12] The state argues that, absent bad faith, the burden should rest with the defendant to prove the harmfulness of this error. We refuse to adopt the position espoused by the state. Given the fact that the destruction or preservation of the investigatory tapes are totally within the state's control, we will not disturb our prior conclusion that the burden properly shifts to the state to prove the harmlessness of the state's nondisclosure.

ate standard applicable to that inquiry. We therefore turn first to determine whether, in the present case, the state must show that the nonproduction of Simmons' tape recorded statement was harmless beyond a reasonable doubt or must show that it is more probable than not that the defendant was not prejudiced.

In *Williamson,* we noted that our rules contained in Practice Book §§ 752 and 755 are patterned on the Jencks Act, 18 U.S.C. § 3500, and that we consequently look to federal case law for guidance when claims are raised under these sections. Id., 13. "In general, because a Jencks violation is not of constitutional dimension; see *United States* v. *Augenblick,* [393 U.S. 348, 356, 89 S. Ct. 528, 21 L. Ed. 2d 537 (1969)]; *Palermo* v. *United States,* 360 U.S. 343, 345, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1959); *State* v. *Myers,* supra, 469 n.7; the government is not required to establish harmlessness beyond a reasonable doubt. See *United States* v. *Wallace,* [848 F.2d 1464, 1471 (9th Cir. 1988)] . . . . This principle, however, is not absolute. As the court observed in *United States* v. *Augenblick,* supra, 356, '[i]t may be that in some situations, denial of production of a Jencks Act type of a statement might be a denial of a Sixth Amendment right.' See also *Palermo* v. *United States,* supra, 362–63 (Brennan, J., concurring) . . . . Thus, 'the failure to provide material to which the defendant is entitled under the Jencks Act may adversely affect a defendant's ability to cross-examine government witnesses and thereby infringe upon his constitutional right of confrontation.' *Krilich* v. *United States,* [502 F.2d 680, 682 (7th Cir. 1974), cert. denied, 420 U.S. 992, 95 S. Ct. 1429, 43 L. Ed. 2d 673 (1975)] . . . . " (Citations omitted.) *State* v. *Williamson,* supra, 20–21.

In *Williamson,* we indicated that under the facts there presented, we would not have been unwarranted in "strictly applying" the harmless error doctrine to

require the state to prove harmlessness beyond a reasonable doubt.[13] Id., 23. We relied on several factors that indicated that Williamson's opportunity to impeach the state's witness was so impaired that the nonproduction of that witness' pretrial statement violated his constitutional right to confront the witnesses against him: "This is not a case in which either the trial court or a reviewing court has access to the unproduced material. . . . Further . . . this is not a case in which the declarant read and adopted a counterpart transcript within a short time after making the statement. . . . Moreover, the defendant's conviction obviously rested on [the testimony of the witness whose pretrial statement had been destroyed]." Id., 22–23.

The present case is clearly distinguishable from *Williamson.* Prior to the commencement of trial, Simmons gave two tape recorded statements to the New Haven police, both of which were subsequently transcribed. The tape of the second statement was preserved. At issue in this case, therefore, is the first tape recorded statement that was not preserved. It is significant that Simmons read and signed the transcription of his first statement only three days after he had given that statement. Cf. id., 23 (witness did not review the transcript of her statement until the first day of trial, some seven months after she had made the statement). Further, the defendant's conviction was not based solely on the testimony of Simmons. Rather, several witnesses provided circumstantial evidence that collectively resulted in the defendant's conviction. Cf. id. (defendant's conviction obviously rested on the testimony of the victim-witness whose tape recorded statement had been destroyed). Under these circumstances,

---

[13] We in fact did not apply the strict standard, however, because we determined that even under the more probable than not standard the state had failed to prove the harmlessness of the state's nondisclosure. *State* v. *Williamson,* 212 Conn. 6, 23, 562 A.2d 470 (1989).

we conclude that the state's failure to produce Simmons' tape recorded statement did not rise to the level of a denial of the defendant's right to confrontation. Accordingly, the standard to be applied to the harmless error inquiry is whether the state has met its burden of proving that it is more probable than not that the state's nonproduction of Simmons' statement was harmless.

In applying the balancing test set forth previously, we must weigh the state's culpability in the destruction of Simmons' tape recorded statement against the prejudice suffered by the defendant as a result of that destruction to determine whether the trial court abused its broad discretion in denying the defendant's motion to strike. Id., 16; *State* v. *Shaw,* supra, 386. The New Haven police deliberately, though not in bad faith, destroyed the first tape recorded statement given by Brian Simmons.[14] Turning to the question of prejudice, we first note that the defendant had access to numerous other sources for use during his cross-examination of Simmons. Where there are critical inconsistencies between trial testimony and prior statements, and between the prior statements themselves, a defendant may be prejudiced by the absence of the tape recording. See *State* v. *Williamson,* supra, 24–25. Where all indications are, however, that the witness has given consistent statements, we have been reluctant to find

---

[14] According to the New Haven police officers who testified at the preliminary hearing, when Simmons' first statement was recorded and transcribed, "[t]here was more or less an informal policy that [tape recorded] statements . . . would be kept." The officers did not know, however, if this "informal" policy had been articulated to each and every member of the police department. In any event, the taped statement given by Brian Simmons was intentionally erased so that the tape could be reused for other police business. A written policy was not produced by the department until the Appellate Court's reversal in *State* v. *Williamson,* 14 Conn. App. 108, 552 A.2d 815 (1988), of a conviction based upon the department's destruction of tapes.

that the defendant suffered prejudice. *State* v. *Palmer,* 206 Conn. 40, 59, 536 A.2d 936 (1988); *State* v. *Mullings,* supra, 10; *State* v. *Myers,* supra, 469. The trial court in the present case found no variation in Simmons' recollection of the events that occurred on the night of Meyer's murder. Upon review, we likewise find no inconsistencies among the transcription of Simmons' first statement, the transcription of his second statement for which the tape was preserved, the police report made at the time of his first statement, and his trial testimony. Cf. *State* v. *Williamson,* supra, 24–25 (numerous inconsistencies between prior statements and trial testimony was a major factor in determining that the state had not proven harmlessness of non-disclosure). We also find significant the fact that Simmons reviewed the transcript of his statement only three days after he had given the statement. See *State* v. *Santangelo,* supra, 589 (typed transcript signed five days after tape recorded statement); *State* v. *Milum,* 197 Conn. 602, 617–18, 500 A.2d 555 (1985) (typewritten copy reviewed and signed by witness shortly after tape recorded statement); cf. *State* v. *Williamson,* supra, 25 (fact that transcript of tape was not reviewed by witness-victim until several months after the alleged crime significant factor in determining that state had not proven harmlessness of nondisclosure).

The defendant does not point to specific inconsistencies, but rather argues that the trial court's finding of no prejudice to the defendant was erroneous because: (1) Simmons was unable accurately to perceive and remember events that occurred on the night of Meyer's murder and three days later when he attested to the accuracy of the transcription; and (2) there existed numerous blanks in the transcription of Simmons' first statement. During cross-examination, the defendant elicited that, on the night of Meyer's murder, Simmons was taking antabuse, a drug used by alcoholics to con-

trol their drinking. Despite warnings to the contrary, Simmons ingested at least one can of Colt 45 beer while on this medication. While we do not dispute the defendant's claim that Simmons' recollection of the events on the night in question might have been affected by this ingestion, his statements and trial testimony were nonetheless consistent with one another. The credibility of Simmons' testimony, as affected by the medication and the beer, was for the jury to determine. See *State* v. *McKnight,* 191 Conn. 564, 571–72, 469 A.2d 397 (1983). Further, Simmons attested to the accuracy of the transcription of his first statement three days after he had given that statement. It was within the trial court's broad discretion to determine that, despite the circumstances, Simmons was capable of assessing the accuracy of that transcription. As to the blanks in the transcription of Simmons' first statement, the police officers testified at the pretrial hearing that blanks indicate either a pause or a section of tape that is inaudible and cannot be transcribed. The trial court concluded that the blank spaces did not occur at any significant locations within the context of the statement, a finding with which we do not disagree. Thus, with respect to the pauses and inaudible words, the unavailability of the tape did not prejudice the defendant. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to strike the trial testimony of Simmons.

## II

The defendant next claims that the court's instructions in defining reasonable doubt were erroneous because of the inclusion of the following sentence: "What [the law] does require is that the guilt be established as charged beyond a reasonable doubt which is one founded upon the evidence, *one which you as reasonable and prudent men and women would be willing to act upon in the more weightier and important mat-*

*ters relating to your own affairs.*"[15] (Emphasis added.) The defendant argues that the inclusion of this language in the charge to the jury had the effect of shifting, diluting and/or reversing the state's constitutional burden to prove a defendant guilty beyond a reasonable doubt.

The defendant concedes that he never excepted to this portion of the charge, but seeks review of this claim pursuant to *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). We recently restated the *Evans* guidelines for dealing with alleged constitutional violations that are raised for the first time on appeal. *State* v. *Golding,* 213 Conn. 233, 238–42, 567 A.2d 823 (1989). In *Golding,* we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the

---

[15] The portion of the charge defining reasonable doubt was as follows: "Now a reasonable doubt means this. It is a doubt for which a reasonable man or woman can give a valid reason. The burden of proving his guilt beyond a reasonable doubt requires the State to produce sufficient evidence to create in your minds a strong and abiding conviction of the guilt of the defendant. In other words, it is the law that the evidence must be so sufficient that it would leave no room in your minds for any reasonable hypothesis of the innocence of the accused. A reasonable doubt is not a doubt raised by one who questions for the sake of raising a doubt. A reasonable doubt is not a surmise, speculation, conjecture or an imaginary doubt. A reasonable doubt is not a captious or a frivolous doubt, nor is it a doubt which is raised by the ingenuity of counsel or by a juror and unwarranted by the evidence. Nor is it a doubt prompted by sympathy for the defendant. A reasonable doubt is a real doubt, an honest doubt, a doubt which has its foundation in the evidence offered in the case or the lack of evidence. Absolute certainty in the affairs of life is almost never attainable and the law does not require absolute certainty to authorize a conviction. What it does require is that the guilt be established as charged beyond a reasonable doubt which is one founded upon the evidence, one which you as reasonable and prudent men and women would be willing to act upon in the more weightier and important matters relating to your own affairs. It is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion."

claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40. We conclude that the defendant's fundamental constitutional right that the state establish his guilt beyond a reasonable doubt; *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); was not violated.

This court was faced recently with this identical claim of error. *State* v. *Smith,* 210 Conn. 132, 554 A.2d 713 (1989). In *Smith,* we disapproved of the instruction here at issue, but concluded that, according to federal precedent,[16] it does not "constitute reversible error, let alone constitutional error in an otherwise adequate charge upon reasonable doubt." Id., 150. This conclusion is dispositive of the defendant's claim of error. The defendant presents no other criticism of the trial court's charge on the subject of reasonable doubt, and from our review we find it sufficient as a whole to define the standard of proof necessary for conviction in a criminal case. Accordingly, although we disapprove of the

---

[16] *Holland* v. *United States,* 348 U.S. 121, 140, 75 S. Ct. 127, 99 L. Ed. 150 (1954), reh. denied, 348 U.S. 932, 75 S. Ct. 334, 99 L. Ed. 731 (1955) (despite the trial court's charge to the jury that reasonable doubt was " 'the kind of doubt . . . which you folks in the more serious and important affairs of your own lives might be willing to act upon,' " the United States Supreme Court concluded that "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury"); *United States* v. *Nuccio,* 373 F.2d 168, 175 (2d Cir.), cert. denied, 387 U.S. 906, 87 S. Ct. 1688, 18 L. Ed. 2d 623 (1967) (in reviewing an instruction defining reasonable doubt in terms of acting, the Second Circuit Court of Appeals found it "impossible to believe, in the absence of any evidence such as a request for further instructions, that jurors would retain such a nuance in their minds and be significantly influenced by it").

portion of the instruction under attack, we conclude that its inclusion does not rise to the level of a constitutional violation.

There is no error.

In this opinion PETERS, C. J., and SANTANIELLO, J., concurred.

SHEA, J., with whom COVELLO, J., joins, concurring. Although I agree with the result reached by the majority, I continue to adhere to the view, expressed in my dissenting opinion in *State* v. *Williamson,* 212 Conn. 6, 29–30, 562 A.2d 470 (1989), that "in respect to nonconstitutional rights of an accused . . . he bears the burden of proving prejudice by showing that the outcome of the trial would probably have been different if the nonconstitutional infraction had not occurred."

In *Arizona* v. *Youngblood,* 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989), a case involving the intentional but not malicious destruction by the police of physical evidence that, if preserved, might have exonerated the defendant, the United States Supreme Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Similarly, the failure of the police in this case to preserve the tape recordings of the witnesses' statements, even though it is possible that their contents might have deviated from the testimony at trial, is not a constitutional infringement, but is based wholly upon General Statutes § 54-86b and Practice Book § 752.

Because the failure to preserve the tapes in this case did not violate any constitutional right, we should fol-

low the rule applied to nonconstitutional breaches of a defendant's right to disclosure. When such a nondisclosure occurs, the defendant bears the burden of showing that the outcome of the trial would probably have been different if the undisclosed evidence had been made available. *United States* v. *Bagley,* 473 U.S. 667, 681–82, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id., 682. There is no basis for distinguishing in respect to the burden of proving prejudice the failure to disclose tape recordings that might have been helpful to the defense from the nondisclosure of other evidence that the state should have preserved.

Accordingly, I concur in the result.