STATE OF CONNECTICUT *v.* JASON GRAY
(14172)

SHEA, J., GLASS, COVELLO, BORDEN and BERDON, Js.

Argued December 5, 1991—decision released April 21, 1992

*David M. Reilly,* with whom were *Matthew G. Galligan* and *Peter B. Reilly,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David Gold,* assistant state's attorney, for the appellee (state).

COVELLO, J. This is the defendant's appeal from his conviction of arson in the first degree in violation of

General Statutes § 53a-111 (a) (1).[1] Following a jury trial and a guilty verdict, the trial court rendered judgment sentencing the defendant to fifteen years imprisonment, execution suspended after six years, and five years probation. The issues on appeal are: (1) whether the evidence presented at trial was sufficient to support the defendant's conviction; (2) whether the trial court improperly ruled on the admissibility of certain evidence; (3) whether the trial court improperly refused to charge the jury upon a variety of subjects as requested by the defendant; and (4) whether the proceedings, when viewed in their totality, denied the defendant the right to a fair trial. We affirm the judgment.

The jury might reasonably have found the following facts. At the time of the July 7, 1989 fire, the defendant and Calvin Hugins both worked under the supervision of Peter Keselewski in the parts department at Ekblade Oldsmobile (Ekblade), an automobile dealership and service center in Hamden. The defendant had been employed in the parts department for two months, picking up and delivering parts to various automobile dealerships, garages and automotive body shops. Hugins had been employed as the clerk at the parts department service counter for two years, supplying parts to either the service center or retail customers.

The parts department is located in a two story building. The first floor contained, inter alia, a service counter, metal bins, and a desk. Ekblade used the service counter to display small quantities of high demand items such as oil filters and antifreeze. The metal bins contained small parts and various chemicals, including

---

[1] General Statutes § 53a-111 (a) (1) provides that "[a] person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied."

WD-40 and Siloo, a diesel fuel antigel. Ekblade did not store these chemicals on the second floor. The second floor, which can only be reached by a flight of stairs at the rear of the first floor, contained, in part, cartons of oil filters and large parts. It is a five foot by thirty-three foot room with a plywood floor, a concrete ceiling supported by joists, and rows of storage shelves.

On July 6, 1989, at 3 p.m., the defendant informed Hugins that he had noticed a chemical smell emanating from the second floor of the parts department. Hugins, unable to detect any chemical odor, told the defendant to speak to their supervisor, Keselewski. Also that day, the defendant told an Ekblade employee from another department, Marianne McKeon, that he smelled something unusual coming from the second floor. McKeon, like Hugins, did not notice anything unusual but, similarly, urged the defendant to inform Keselewski. Later, at 4 p.m., Keselewski asked the defendant to close a window on the second floor. After returning from the second floor, the defendant said nothing about any unusual odors coming from the second floor. At no time did the defendant ever mention his concerns about chemical smells to Keselewski. Keselewski, like McKeon and Hugins, did not detect any chemical smell when he closed the parts department between 5:30 and 6 p.m.

The next day, July 7, 1989, Hugins opened the parts department at 7 a.m. At 8 a.m., the defendant again told Hugins that he smelled chemicals emanating from the second floor. Hugins searched the second floor but did not notice any unusual chemical smell. Approximately fifteen minutes later, between 8:15 and 8:20 a.m., Hugins noticed that the defendant was restocking the parts counter with oil filters that the defendant had obtained from the second floor. At 8:30 a.m., when Keselewski called Hugins from another car dealership, the defendant was talking with McKeon.

About twenty to twenty-five minutes after Hugins observed the defendant shelving the oil filters, Hugins saw smoke coming from the area of the stairs to the second floor. Hugins turned off the first floor lights and reported the fire by telephoning the "911" emergency number. The defendant told McKeon that he had to get his keys and rushed toward his desk in the rear of the first floor. McKeon, who attempted to follow the defendant but then turned back because of the blinding smoke, did not see the defendant again until sometime between 11 a.m. and 12 p.m. when he stated: "[T]hey think I did it."

At 8:44 a.m., Hamden firefighters were sent to Ekblade and they arrived shortly thereafter. The firefighters encountered dense smoke and extreme heat and noticed flames in the eastern and southeastern corner of the second floor. By 9:30 a.m., approximately thirty-five to fifty firefighters were able to subdue the flames.

I

The defendant first claims that the record reflects insufficient evidence to support his conviction. He argues that the state failed to establish, beyond a reasonable doubt, that: (1) the fire was intentionally set; and (2) he was the person criminally responsible for its occurrence. We disagree.

A

Experts for both parties presented conflicting testimony at trial as to whether the fire was incendiary or accidental in nature. The state's expert witnesses, Robert Westervelt, Hamden's fire marshal, Joseph Tuscano, a senior arson inspector, and Jack Hubbell, the chemist in the state forensic laboratory, proffered opinions that tended to show that the fire was intentionally set. Westervelt inspected the scene on the morning

of July 7, 1989, the day of the fire. Tuscano examined the parts department later that month. They both opined that the fire started in the southeast corner of the second floor where there was a "classic pour pattern" on the floor created by the ignition of a flammable accelerant. Westervelt theorized that the arsonist used approximately twelve to fifteen ounces of a liquid accelerant to start the fire. Westervelt and Tuscano noted that the extensive charring at the base of the shelves was consistent with this theory. Tuscano further testified that the rate at which the fire developed was consistent with the ignition of a flammable accelerant.

Westervelt explained that, in contrast to fires ignited by ordinary, combustible items, which start slowly and gradually build in size and strength, fires started by a flammable accelerant burn rapidly. He testified that the pattern of burning on the walls did not follow a straight line, as occurs with a slow burning fire, and that the second floor window panes were clear and did not exhibit the heavy glaze commonly associated with a slow burning fire.

Westervelt further supported his theory that a flammable accelerant had been utilized to start the fire by explaining how he caused forensic tests to be performed on materials he had collected from the scene of the fire. He testified that, at various times, he had taken samples from the second floor area where the fire originated. Among these were liquid that had been sponged from the floor, debris from the southeast corner of the floor, and a can of Siloo. He placed the samples into cans, sealed them and brought them to the state forensic laboratory for analysis. Hubbell tested the floor debris with a mass spectrometer and found the presence of xylenes, an extremely flammable liquid. Upon performing a spectrometric analysis of the Siloo and

comparing it to the xylenes found in the floor debris, Hubbell found that the two samples had an "almost perfect match" in their chemical constituents.

In discounting other possible theories, Westervelt eliminated the second floor light bulbs as a cause of the fire. He determined that all of the bulbs were intact except for one located one foot north of the fire's point of origin. Although the glass portion of that bulb was missing, Westervelt found that the wires and connections were still intact and that there was no evidence of pitting or melting consistent with temperatures that would give rise to sparking. Further, he did not see any material either in contact with or lying on the floor directly beneath this fixture.

The defendant's expert witness, Matthew Conlon, concluded, however, that the fire probably originated at a light bulb and then radiated downward. Conlon based his testimony on examinations of photographs of the fire scene; he did not visit the actual scene of the fire. Conlon opined that a light bulb of a wattage too high for the fixture could have melted and then dripped molten material to the floor causing secondary ignition. Alternatively, he testified that a bulb could have come into contact with material on the upper portion of a shelf thereby causing a fire. Conlon maintained that the burn patterns on the floor were caused by material that had dropped to the floor after the fire had already ignited above ground.

Conlon testified further that an electrical cord, which had originated on the first floor and extended to the second floor, may have been a cause of the fire. He also opined that Hugins would have noticed the fire sooner if the defendant had indeed ignited the flammable accelerant twenty to twenty-five minutes earlier.

It is well established that in reviewing a claim of insufficient evidence, a two-part inquiry is undertaken.

"We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Citations omitted.) *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985). Findings of fact that are consistent with guilt are afforded great deference unless they are improbable and unconvincing. *State* v. *Osman,* 218 Conn. 432, 437, 589 A.2d 1227 (1991). In finding facts in cases of conflicting expert testimony, a jury may choose to believe one expert over another. *State* v. *Famiglietti,* 219 Conn. 605, 612, 595 A.2d 306 (1991).

The jury in this case was entitled to reject Conlon's testimony and credit the testimony of the state's experts that the pour pattern on the floor was a manifestation of the ignition of the flammable accelerant Siloo and that the fire spread from this source. In declining to believe Conlon, the jury was aware that he had never visited the site even though he admitted that it would have been "much better" for purposes of his investigation if he had done so. Additionally, the jury knew that Conlon's theory that the light bulbs had ignited the fire had been rejected by the state's experts. "Once the state's expert testimony was found credible by the jury . . . that evidence established beyond a reasonable doubt that the fire in this case was incendiary in origin." *State* v. *Famiglietti,* supra, 612.

The defendant claims, however, that even if Siloo was the agent used to ignite the fire, there were innocent explanations for its presence in the floor debris. We disagree.

The "jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991), quoting *State* v. *Dumlao,* 3 Conn. App. 607, 616–17, 491 A.2d 404 (1985). Here, the jury was entitled to draw, from conflicting evidence, the following reasonable inferences that reject the defendant's theories and that are consistent with guilt: (1) Siloo was not inadvertently tracked onto the second floor by automobile mechanics because either Hugins or the defendant, not the mechanics, obtained the parts from the second floor; (2) Siloo was not introduced onto the second floor as a result of being left on an automobile cylinder head that was stored there, due to the mechanics' practice of cleaning spare parts prior to storage; (3) the presence of Siloo in the sample can containing debris from the southeast corner was not attributable to contamination during storage from another can leaking Siloo because the leaking can contained a different brand of diesel fuel antigel that would have been detected by the mass spectrometer had it contaminated any of the samples; and (4) the absence of Siloo from samples of the floor and floor board on the second floor could be explained either by evaporation and burning away or by the washing of the floor by firefighters *after* the floor debris samples had been taken but *before* the floor and floor board in question were analyzed.

## B

The defendant next claims that, even if the fire was incendiary, there was insufficient evidence to show that he was culpable. He argues that the evidence was

insufficient because: (1) he did not have the exclusive opportunity to cause the fire; and (2) there was no proof of motive. Because we have never held that proof of either motive or exclusive opportunity is required to convict an accused of arson, we conclude that these claims are without merit. *State* v. *Famiglietti,* supra, 614 (state did not have to establish a motive for arson); *State* v. *McPhail,* 213 Conn. 161, 171, 567 A.2d 812 (1989) (jury was entitled to convict defendant of arson even though others had motive and opportunity to set dwelling on fire).

The jury had before it sufficient evidence to conclude that the defendant was culpable. Based upon evidence that he had an opportunity to set the fire, that he had ready access to Siloo, the flammable accelerant that had started the fire, that he appeared after the fire started to have an insider's knowledge about the nature and location of the fire, and that he manifested before and after the fire a consciousness of guilt, the jury could have reasonably concluded that the defendant was guilty beyond a reasonable doubt. We discuss these conclusions seriatim.

Other than the time, on the morning of the fire, that Hugins spent inspecting the second floor following the defendant's protestations about "chemical smells," the evidence showed that the defendant was the only person who had been on the second floor that day, before Hugins noticed the fire. See *State* v. *Famiglietti,* supra, 614 (accused's presence on premises shortly before start of fire was probative of issue of identity).[2] The

[2] We agree with the dissent that the facts of this case are distinguishable from those in *State* v. *Famiglietti,* 219 Conn. 605, 595 A.2d 306 (1991), in that, here, the defendant did not have sole access to the scene of the fire. The cases are similar, however, insofar as "the record in this case contains direct evidence of the defendant's presence at the premises shortly before the fire and of his continued presence there at a time when [the fire started]." Id., 614. This presence is probative of the perpetrator's iden-

defendant's presence on the second floor immediately preceding the fire was especially significant in view of Keselewski's testimony that it was unprecedented for the defendant to have gone to the second floor on his own initiative to obtain parts. Further, the defendant had ready access to Siloo, which was stored on the first floor near the service counter. See *State* v. *Cimino,* 194 Conn. 210, 213, 478 A.2d 1005 (1984) (access to flammable accelerant probative of issue of identity).

The jury could have reasonably concluded that the defendant knew about the origin and location of the fire when he ran to the back of the first floor to get his keys even after Hugins had noticed the smoke and called "911." The jury was entitled to compare and contrast the defendant's and McKeon's reactions to the dense smoke and conclude that, while McKeon did not follow the defendant toward his desk because the smoke was so thick that she could not see in front of her face nor discern the location of the fire, the defendant was not dissuaded from attempting to retrieve his keys because he was aware that the fire was confined to the second floor.

The jury could also have reasonably concluded that the defendant exhibited a consciousness of guilt both before and after the fire. Before the fire, his attempts at drawing attention to phantom chemical smells on the second floor could reasonably lead one to believe that the defendant was trying to lay the basis for his exoneration by creating the impression that the conditions for a fire were present before the morning of

tity. It is conceivable that someone other than the defendant could have started the fire but not likely. Hugins and Keselewski were never under any suspicion and, furthermore, Keselewski was at another automobile dealership on the morning of the fire. Moreover, although it is hypothetically possible that an unidentified person could have entered the building through the rear door, proceeded to the second floor, lit the fire, and then left undetected, the jury could have reasonably rejected such speculation.

the fire and that it was simply an accidental conflagration. None of the witnesses to the defendant's queries concerning chemical odors noticed any such odor themselves and, significantly, the defendant never mentioned his concern to Keselewski, even after his fellow employees urged him to do so. Following the fire, the defendant told McKeon: "[T]hey think I did it." The defendant made this statement while Westervelt was still investigating the fire at Ekblade and before he had determined that the fire had been deliberately set. The jury might have reasonably concluded that the defendant was experiencing pangs of guilt before any determination of wrongdoing had been made. This is not a case in which the state's evidence is improbable and unconvincing; great deference must be given to the jury's conclusion that the defendant's conduct and statements manifested a consciousness of guilt. *State v. Osman,* 218 Conn. 432, 437, 589 A.2d 1227 (1991).

## II

The defendant next claims that the trial court improperly ruled on the admissibility of certain evidence by: (1) denying his motion to strike McKeon's testimony that the defendant told her that "they think I did it"; (2) admitting the results of tests done on a can of debris taken from the second floor; and (3) admitting the rebuttal testimony of state inspector Tuscano. We address these claims in order.

## A

The defendant claims that McKeon's testimony that he had told her "they think I did it," should have been stricken because it lacked relevance for the purpose of demonstrating consciousness of guilt. He argues that the statement is consistent with innocence and that the state never disproved his contention that law enforcement agents had spoken to him about the fire prior to his making the statement. The defendant maintains on

appeal that he had made the statement to McKeon because he had inferred, after the authorities posed questions to him about whether he had been smoking, that they thought that he might have been responsible for the fire.

"Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters." *Dunham* v. *Dunham,* 204 Conn. 303, 324, 528 A.2d 1123 (1987). Although the trial court found that the defendant's statement could support inferences that were consistent with both guilt and innocence, "[e]vidence need not be conclusive to be relevant; *State* v. *Greene,* 209 Conn. 458, 478, 551 A.2d 1231 (1988); and '[t]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible.' *State* v. *Reid,* [193 Conn. 646, 656 n.12, 480 A.2d 463 (1984)]; see *State* v. *Morrill,* 197 Conn. 507, 508, 498 A.2d 76 (1985)." *State* v. *Joly,* 219 Conn. 234, 252, 593 A.2d 96 (1991).

We conclude that, even if the statement were susceptible to different interpretations, the trial court did not abuse its discretion in determining that the defendant's assertion was relevant. Further, the defendant has not pointed to any evidence other than his own statements, nor do we find any, that indicates that the authorities had spoken to the defendant before he made the statement. The jury might reasonably have concluded that the defendant volunteered this statement not because of any urge to respond to innuendo that he was the responsible party but rather out of a consciousness of guilt. "No one doubts that the state of mind which we call 'guilty consciousness' is perhaps

the strongest evidence . . . that the person is indeed the guilty doer . . . ." 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 273 (1).[3]

## B

The defendant claims next that the trial court improperly admitted into evidence the spectrometric analysis of the contents of the can of debris taken from the second floor near the eastern wall. The defendant asserts that there was no proof that the debris was not contaminated in some way other than by arson. He argues that: (1) the debris could have come into contact with a cylinder head on the second floor that was covered with Siloo, the flammable accelerant found in the same debris; (2) prior to the time that the debris was subject to spectrometric analysis, Siloo could have been absorbed into the can containing the debris while the can was in storage; and (3) the results of the spectrometric analysis lacked probative value because: (a) the debris samples were not taken from the area where Westervelt identified a burn pattern; and (b) Westervelt's opinion on the origins of the fire did not refer to the state chemical laboratory test results. Because we conclude that there is no reasonable probability that the debris contained in state's exhibit T was contaminated by a source other than arson, the trial court did not abuse its broad discretion in determining that the evidence was probative and in admitting

[3] The defendant has raised two other claims related to the admission of his statement. Both merit little discussion.

In light of the lack of evidence that the authorities had spoken to the defendant before he made his statement, we conclude that there is no merit to the defendant's claim that he was forced, in violation of the fifth and fourteenth amendments to the United States constitution, to testify against himself in order to exonerate himself with respect to his statement.

Because we determine that the trial court did not abuse its discretion in admitting the statement, we disagree with the defendant's claim that a curative instruction was required with respect to the admission of the statement into evidence.

this evidence. *State* v. *Asherman*, 193 Conn. 695, 722, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

The trial court might reasonably have concluded that: (1) the cylinder head was not a cause of any alleged contamination because Keselewski had testified that all spare parts were cleaned prior to being stored on the second floor; and (2) the debris was not contaminated with Siloo while in storage because the different brands of diesel fuel antigel, including Siloo, had been stored in separate boxes and the only can that had leaked was a diesel fuel antigel of a different brand than Siloo—a brand that would have been detected by the spectrometric analysis. Further, contrary to the defendant's contention, Westervelt testified that he had taken his samples from the area where the fire originated. Westervelt also testified that he took samples and sent them to the state laboratory for analysis. The fact that Hubbell, the state laboratory chemist, testified as to the results of his tests on the samples Westervelt sent to him *after* Westervelt testified does not mean, as the defendant maintains, that the jury could *not* have concluded that Hubbell's testimony supported Westervelt's opinion that the fire had been started with the aid of a flammable accelerant. The jury is entitled to apply its own knowledge and common sense to the evidence. *State* v. *Sinclair*, 197 Conn. 574, 578, 500 A.2d 539 (1985).

## C

The defendant next argues that Tuscano's testimony was not proper rebuttal testimony but merely bolstered the state's prior testimony that the burn patterns were consistent with arson instead of specifically addressing or refuting the possibilities raised by the defense of accidental causes of the fire. For these reasons he maintains that the trial court should not have admitted Tuscano's testimony.

"The admission of rebuttal evidence is . . . within the sound discretion of the trial court." *State* v. *Lisella,* 187 Conn. 335, 337, 445 A.2d 922 (1982). There is no requirement that a rebuttal witness must respond to every alternate theory offered by the defendant concerning the possible origin of the fire; a general contradiction of the testimony given by the defendant is considered permissible rebuttal testimony. *State* v. *Simino,* 200 Conn. 113, 123, 509 A.2d 1039 (1986). Tuscano's assessment that the burn patterns at the fire scene were consistent with the ignition of a flammable accelerant generally contradicted the testimony of defense expert Conlon. Moreover, Tuscano's testimony directly refuted Conlon's testimony that the fire burned at a rate that was inconsistent with the use of a flammable accelerant.

## III

The defendant next claims that the trial court improperly failed to instruct the jury as requested in a number of areas. We address these claims seriatim.

## A

The defendant first claims that the trial court improperly failed to charge, as requested, that there would be insufficient evidence of identity if the state failed to demonstrate that he had exclusive access to the second floor. We have already addressed the merits of this claim in reviewing the defendant's contention that the evidence was insufficient to convict him. As we stated with respect to that claim, we have never held that the state must prove that the defendant had exclusive access to the scene of the fire in order to obtain a conviction. *State* v. *McPhail,* 213 Conn. 161, 171, 567 A.2d 812 (1989). "The principal function of a jury charge is 'to assist the jury in applying the law correctly to the facts which they might find to be established . . . .' " *State* v. *Hernandez,* 218 Conn. 458, 462, 590 A.2d 112

(1991), quoting *State* v. *Sumner,* 178 Conn. 163, 170, 422 A.2d 299 (1979). We conclude that the trial court accomplished just that in its charge.

B

The defendant next claims that the trial court improperly refused to charge, as requested, that the state must proffer evidence that rules out all innocent explanations for the cause of the fire that are reasonably possible. We disagree.

"Proof of guilt [beyond a reasonable doubt] must exclude every reasonable supposition of innocence. . . . [I]t need not exclude every possible supposition of innocence." (Internal quotation marks omitted.) *State* v. *Little,* 194 Conn. 665, 672, 485 A.2d 913 (1984). Here, the trial court correctly charged the jury that proof beyond a reasonable doubt must exclude every reasonable hypothesis inconsistent with guilt.

C

The defendant next claims that the trial court improperly refused to charge, as requested, that the jury could not infer that the author of an article relied upon by the defendant had been disciplined or fired for employing improper laboratory techniques based solely upon questions to that effect posed by the prosecutor. Although briefed in a most limited fashion, the gravamen of the defendant's claim appears to be that questions posed by the prosecutor did not constitute evidence or a basis for drawing factual inferences. "If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal." *State* v. *Ortiz,* 217 Conn. 648, 662, 588 A.2d 127 (1991). Although the trial court did not specifically instruct as requested, the jury received the substance of the request in the instruction that evidence is con-

fined to either exhibits or the testimony of witnesses. Further, "[t]he jury is presumed, in the absence of a fair indication to the contrary, to have followed the [trial] court's instructions as to the law." *State* v. *Gabriel,* 192 Conn. 405, 416, 473 A.2d 300 (1984).

## IV

The defendant's final claim is that he was denied a fair trial pursuant to the due process guarantees of the fifth and fourteenth amendments to the United States constitution. The defendant essentially repeats, in a summary fashion, the allegations raised throughout the rest of his brief. The absence of merit underlying those claims refutes this last claim.

The judgment is affirmed.

In this opinion SHEA, GLASS and BORDEN, Js., concurred.

BERDON, J., dissenting. I disagree. The evidence construed in the light most favorable to sustaining the jury's verdict; *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985); is insufficient to support the finding of guilt beyond a reasonable doubt, even if we assume the fire was incendiary—that is, intentionally set.

In making our determination of whether the evidence was sufficient to convict the defendant, we place great weight on the trial court's decision on the motion to set aside the verdict and the motion for judgment of acquittal; *State* v. *Cobbs,* 203 Conn. 4, 13, 522 A.2d 1229 (1987); but its decision does not carve the conviction in stone. "The trial court's findings of fact are not conclusive, however, and we will reverse a judgment where the state's evidence is improbable and unconvincing and where all the facts found are insufficient to prove the

guilt of the defendant beyond a reasonable doubt." *State* v. *Osman,* 218 Conn. 432, 437, 589 A.2d 1227 (1991).

The majority predicates its conclusion that there was sufficient evidence to support the conviction of the defendant on the following: (1) The defendant had an opportunity to set the fire, including ready access to Siloo, the accelerant the state theorized had been used to start the fire; (2) the defendant had an "insider's knowledge about the nature and location of the fire"; and (3) the defendant had manifested a consciousness of guilt. The collective effect of this evidence, however, was insufficient to establish beyond a reasonable doubt the defendant's guilt.

First, although the defendant had the opportunity to set the fire, he did not have sole access to the second floor where the fire originated or to the accelerant. We have held that opportunity alone, although a consideration, proves nothing. *State* v. *Villano,* 176 Conn. 301, 303, 407 A.2d 969 (1978); *State* v. *Skinner,* 132 Conn. 163, 167, 43 A.2d 76 (1945). *State* v. *Famiglietti,* 219 Conn. 605, 614, 595 A.2d 306 (1991), to which the majority cites, is inapposite. In *Famiglietti,* the defendant arrived at the store shortly before the fire, the store was locked and no one else was visible inside. The jury heard testimony from the Sonitrol operator that the defendant had "coded out" just minutes before he noticed the fire. The operator also testified that he had heard "crackling" and "loud popping noises" while the defendant was still in the building. Id., 613. In the present case, however, the state concedes that the defendant did not have exclusive access to the premises. At least two other people, Calvin Hugins and Peter Keselewski, had unlimited access to the fire scene and to the Siloo, which gave them the same opportunity the defendant had to set the fire. Moreover, the majority concedes that Hugins had been to the second

floor on the morning of the fire. Additionally, there was proof of access to the second floor by a rear door and there was no proof that it was closed, or locked, and no evidence that it was guarded, or under anyone's observation.

In *State* v. *Villano,* this court reversed the defendant's conviction for burglary, even though the defendant had been given a key to the house and, therefore, had *sole* access to it. The evidence in *Villano* showed that "[a]ll the doors and windows, including those in the cellar, were found locked. There was no sign of a forced entry. The [complainants] had not given anyone but the defendant permission to enter their home and no one else had a key to the premises." Id., 302. Notwithstanding the defendant's sole access to the premises, this court concluded in *Villano* that "it is clear that there was not sufficient evidence before the [trial] court to establish beyond a reasonable doubt that the defendant was guilty of the crimes charged." Id., 303. I cannot reconcile the majority's opinion in the present case, given that here the defendant did not have sole access to the premises where the fire originated, with the just result reached in *Villano.*

Second, the defendant's culpability cannot be predicated on the claim that the defendant "had an insider's knowledge about the nature and location of the fire." The defendant never stated that he had known that the fire had been located on the second floor. I cannot see how the jury could have reasonably concluded that the defendant's act of running to the back of the first floor to retrieve his truck keys amounted to an "insider's knowledge" of the origin and location of the fire. The reverse is more logical—that is, had he set the fire, he would not have left his keys in the building in the first place.

Third, the majority states that the defendant's behavior, both before and after the fire, had "manifested a consciousness of guilt." Before the fire, the defendant repeatedly stated that he had smelled chemicals. Although this behavior could arguably be construed as laying the foundation that the fire had been accidental in nature, the opinion fails to cite any authority to support this "pre-crime" consciousness of guilt. Actions or words manifesting a consciousness of guilt, unlike evidence establishing the defendant's motive or plan, are logically predicated on the crime already having been committed. See, e.g., *State* v. *Joly,* 219 Conn. 234, 251, 593 A.2d 96 (1991); *State* v. *Smith,* 219 Conn. 160, 165, 592 A.2d 382 (1991); *State* v. *Thomas,* 214 Conn. 118, 121, 570 A.2d 1123 (1990).

The majority further states that the defendant's statement to Annie McKeon after the fire, that "they think I did it," manifested a consciousness of guilt. The reasoning is based on the claim that no one had spoken to the defendant accusing him of setting the fire before he had made the statement. There is not a shred of evidence, however, to support this claim. Furthermore, the "they think I did it" statement is taken wholly out of context. McKeon went on to testify as follows:

"Q. On that date do you recall whether or not you were asked a question on 7/28/89, question, 'Has he given any indication that he personally had started the fire?'

"A. Yeah, I remember the question.

"Q. And what was [your] answer to that question?

"A. No.

"Q. At that time you told Mr. Dunham [a detective] that he had given no indication that he personally had started the fire?

"A. No."

Again, without more, I cannot see how the defendant's statement to McKeon revealed a consciousness of guilt. Surely, to convict the defendant on the basis of this evidence, "the jury would have had to resort to speculation and conjecture and to have drawn unwarranted inferences from the facts presented." *State* v. *Osman,* supra, 437.

Lastly, and perhaps most troubling for me, is the lack of a motive. The absence of motive was also troubling for the sentencing court.[1] Although I am aware that it is not necessary to prove motive in an arson prosecution; see *State* v. *Pinnock,* 220 Conn. 765, 792, 601 A.2d 521 (1992); in a case where the evidence is paper thin, lack of motive is significant. In *Pinnock,* we held that "presence *or absence* of motive . . . is a circumstance to be weighed with other evidence for the jury to consider. . . . *State* v. *Ruffin,* 206 Conn. 678, 681, 539 A.2d 144 (1988); *State* v. *Annunziato,* 169 Conn. 517, 530, 363 A.2d 1011 (1975). An instruction on motive and lack of motive is sometimes required because [e]vidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. *State* v. *Rathbun,* 74 Conn. 524, 529, 51 A. 540 (1902). *State* v. *Harris,* 182 Conn. 220, 224, 438 A.2d 38 (1980). The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. The other evidence may be such as to justify a conviction without any motive being shown. It may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt. *State* v. *Rathbun,* supra, 529–30."

[1] The sentencing court stated: "To say the obvious, this is a case that troubles the Court very much. It troubled me during the course of the trial, because, as everyone will recall, even as a part of the arguments in the case and with reference to the instructions, there never appeared to be any particular motive for whatever happened [at] Eckblade on that particular day."

(Emphasis in original; internal quotation marks omitted.) *State* v. *Pinnock,* supra, 790. Indeed, under the facts of this case, the lack of a disclosed motive presented a fatal blow to an already weak case.[2]

"It is axiomatic that any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused must prevail. *State* v. *Guilfoyle,* 109 Conn. 124, 139, 145 A. 761 [1929]. *State* v. *Foord,* 142 Conn. 285, 294, 113 A.2d 591 (1955); *State* v. *Morrill,* [193 Conn. 602, 610, 478 A.2d 994 (1984)]. The trier may not reach a conclusion of guilt where the facts, established by the evidence, including those reasonably and logically inferred from other proven facts, are rationally consistent with the innocence of an accused. A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion. *State* v. *Smith,* 138 Conn. 196, 200, 82 A.2d 816 [1951]. *State* v. *Foord,* supra, 295; *State* v. *Martin,* [195 Conn. 166, 173, 487 A.2d 177 (1985)]; *State* v. *Morrill,* supra, 610–11. Moreover, inferences which do not have a basis in facts established by the evidence cannot be drawn or relied upon to sustain a verdict. *State* v. *Jackson,* 176 Conn. 257, 264, 407 A.2d 948 (1978). The jury may not resort to speculation and conjecture. *State* v. *Saracino,* 178 Conn. 416, 419, 423 A.2d 102 (1979). If the evidence is insufficient to sustain the burden of proof beyond a reasonable doubt, the verdict must be set aside. *State* v. *Jackson,* supra,

[2] Moreover, "especially when the prosecution's case against the criminal defendant is circumstantial, the fact that the defendant had some motive, good or bad, for committing the crime is one of the circumstances which, together with other circumstances, may lead the factfinder to conclude that he did in fact commit the crime; whereas lack of any discernible motive is a circumstance pointing in the direction of his innocence." 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.6 (b), p. 324.

262." (Internal quotation marks omitted.) *State* v. *Carpenter*, 214 Conn. 77, 84, 570 A.2d 203 (1990). It is clear to me that the defendant was deprived of his state and federal constitutional rights to due process of law because, given the tenuous nature of the evidence used to convict him, the state did not meet its burden of proof beyond a reasonable doubt and, therefore, to convict the defendant, the jury must have resorted to speculation and conjecture. See *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Carpenter,* supra, 82.

Because I would vacate the judgment and remand the matter to the trial court with direction to render judgment that the defendant was not proven guilty of the crime of arson in the first degree beyond a reasonable doubt, I have not discussed the defendant's other claims of error. By not addressing them, I do not adopt the conclusion and reasoning of the majority on some of these issues. Accordingly, I respectfully dissent.